HONDA ET AL. *v.* CLARK, ATTORNEY GENERAL.

No. 164.   Argued February 14, 1967.—Decided April 10, 1967.

*Joseph L. Rauh, Jr.,* argued the cause for petitioners. With him on the briefs were *John Silard,* *A. L. Wirin, Fred Okrand* and *Benjamin V. Cohen.*

*Richard A. Posner* argued the cause for respondent. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Sanders, David L. Rose* and *Richard S. Salzman.*

*Thomas C. Lynch,* Attorney General, *Charles A. O'Brien,* Chief Deputy Attorney General, and *Charles W. Rumph,* Deputy Attorney General, filed a brief for the State of California, as *amicus curiae,* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioners are 4,100 United States citizens or residents of Japanese descent seeking to recover funds vested under

the Trading with the Enemy Act, 40 Stat. 411, 50 U. S. C. App. § 1 *et seq.* The District Court dismissed their suit against the Attorney General [1] as barred by limitations, and the Court of Appeals affirmed by a divided vote. 123 U. S. App. D. C. 12, 356 F. 2d 351. We granted certiorari because of the importance and unusual character of the questions involved, affecting the proper application of this wartime statute. 385 U. S. 917.

Both as the case was treated by the lower courts and as it was largely argued here, the limitations issue has been thought to turn on whether the Government is estopped from asserting the 60-day time bar provided for actions of this kind by § 34 (f) of the Trading with the Enemy Act. We conclude, however, that "estoppel" is not the controlling issue, but that for reasons discussed in this opinion the period of limitations was tolled, requiring reversal of the judgment below.

## I.

Upon the outbreak of hostilities with Japan, the United States, on December 7, 1941, acting under the Trading with the Enemy Act, seized the American assets of businesses owned by Japanese nationals, among such property being the assets of the Yokohama Specie Bank, Ltd. The assets of the bank were liquidated, and in 1943 were vested in the Alien Property Custodian; see *Paramount Pictures, Inc.* v. *Sparling,* 93 Cal. App. 2d 768, 770–771, 209 P. 2d 968, 969–970. Petitioners were among the approximately 7,500 depositors of the bank

---

[1] This suit was originally filed against Robert F. Kennedy, then Attorney General. Nicholas deB. Katzenbach was substituted as statutory defendant in the District Court, and Ramsey Clark, the present Attorney General, succeeded him as respondent here by operation of law. Sup. Ct. Rule 48 (3).

holding "yen certificates," [2] who submitted timely claims, many being filed as early as 1946, under § 34 of the Act seeking recovery of their deposits.

Section 34 of the Act was enacted in 1946 as a legislative response to this Court's decision in *Markham* v. *Cabell*, 326 U. S. 404, which allowed nonenemy creditors of former owners of vested property to bring suit under a World War I statute,[3] and recover directly out of vested assets. The Alien Property Custodian feared that allowance of such suits might lead to inequitable results, in that creditors who brought suit immediately might exhaust the assets at the expense of other, equally valid, claims. The Custodian urged, and the Congress agreed, that an approach on the lines of the Bankruptcy Act was a fairer method of distributing such assets.[4] See H. R. Rep. No. 2398, 79th Cong., 2d Sess., 10, 14 (1946); S. Rep. No. 1839, 79th Cong., 2d Sess., 4, 8 (1946). As in bankruptcy law, the new Act required the filing of a

---

[2] The certificates expressed their value in terms of yen, and bore the following statement, in both Japanese and English:

"This is to certify that the sum of yen ———. has been submitted to our Head Office, Yokohama, to be placed in Fixed Deposit there in your name at — percent. per annum for — months, maturing ———, subject to the conditions on the back hereof.

"Both principal and interest are payable, when due, at our aforesaid Head Office, Yokohama, upon surrender of this Certificate, properly endorsed and/or sealed."

[3] Section 9 (a) of the Trading with the Enemy Act, 50 U. S. C. App. § 9 (a).

[4] Section 34 (a) limits allowable debt claims only to "those of citizens of the United States or of the Philippine Islands; those of corporations organized under the laws of the United States or any State, Territory, or possession thereof, or the District of Columbia or the Philippine Islands; those of other natural persons who are and have been since the beginning of the war residents of the United States and who have not during the war been interned or paroled pursuant to the Alien Enemy Act; and those acquired by the Custodian."

debt claim with the Custodian within a specified period, § 34 (b).

Approximately 7,500 yen certificate holders, including petitioners, immediately complied with this provision and submitted photostatic copies of their respective certificates. In the course of processing the claims pursuant to § 34 (f) a question arose as to the redemption value of the certificates both for depositors of the Yokohama Specie Bank and for those of another bank, the Sumitomo Bank, holding similar certificates. An administrative determination was sought in a proceeding brought in the name of one of the Yokohama Bank depositors, Kunio Abe, Claim No. 55507. Abe, acting for all yen certificate holders, took the view that since these deposits had been made in American dollars, and the certificates were allegedly redeemable in dollars at any time upon demand at American branches of the bank, they should be treated as dollar debts at the amount of their value when seized in 1941, at a rate of about 4.3 yen to the dollar. The Attorney General,[5] however, characterized the debts as yen debts, and following the rule of *Deutsche Bank* v. *Humphrey*, 272 U. S. 517, and *Zimmermann* v. *Sutherland*, 274 U. S. 253, held that the proper measure of recovery would be at the postwar conversion rate of 361.55 yen to the dollar, or less than 2% of the prewar rate. It is noteworthy that throughout this period the Yokohama Bank's successor in Japan, the Bank of Tokyo, Ltd., was willing to redeem these certificates at the postwar rate. Petitioners, at any time, could therefore have received from the Japanese bank the amount the Government asserted would eventually be obtained from the vested assets.

At the conclusion of the administrative process, in 1958–1959, the Chief of the Claims Section wrote to each

---

[5] The Attorney General assumed the duties of the Custodian in 1946 by Executive Order No. 9788, 11 Fed. Reg. 11981.

of the depositors who had filed a claim, including petitioners, advising that "The Director of this Office decided on -November 13, 1957, *In the Matter of Kunio Abe, et al.,* Claim No. 55507, Docket No. 55 D 72, which decision the Attorney General has declined to review, that yen certificates of deposit issued by the Yokohama Specie Bank, Ltd. . . . are obligations payable in yen in Japan . . . ," and therefore that the postwar rate of 361.55 yen to the dollar would be used in redeeming certificates from the vested assets. Claimants were told to submit their original certificates within 45 days. However, the letter continued, "Payment of your claim . . . will not be made immediately." The letter informed the claimant that a full schedule of claimants would be made, § 34 (f), and that after its issuance aggrieved certificate holders might file suit in the United States District Court for the District of Columbia for judicial review. "Under the circumstances," the letter continued, "you may wish to utilize the funds in Japan. rather than await settlement by this Office. If this is done, the Notice of Claim filed with this Office should be canceled by signing and mailing the enclosed Notice of Cancellation of Claim card."

Petitioners characterize this letter as "confusing" and "insulting." We think the opprobrium which is sought to be fastened on the letter is undeserved and consider it more accurate and fairer to say that although its instructions were complex, the letter was written in a manner designed reasonably to apprise a layman of the choices before him. However, on the particular facts of this case and given the empirical evidence available, it is quite understandable that of the 7,500 initial claimants, only 1,817 responded affirmatively by sending in their certificates, and less than 1,600 canceled their claims and sought immediate recovery in Japan. The remainder, a majority of all who had claims, petitioners in this case, did nothing.

The reasons for their inaction are quite apparent, and, it can reasonably be argued, should have been so to the Government: the letter indicated that despite as long as 12 years of waiting after the original submission of their claims, supported by copies of their certificates, they could expect to receive less than 2% of their basic deposits measured in prewar dollar terms, and that even this amount would not be forthcoming immediately, but only after issuance of a schedule (an additional interval, it turned out, of three years) plus possible judicial review. Claimants would clearly be better off getting repayment immediately from the Japanese bank itself. This recourse, suggested by the letter itself, was at the same time understandably advantageous to the Government as well: American citizens or residents would obtain relief, but from a foreign source, thus freeing more of the vested assets for distribution to remaining claimants. It is thus understandable that the Government did nothing to ascertain why a majority of the 7,500 claimants had responded in no way to its letter.

In affidavits submitted to the District Court, and not contradicted on the motion to dismiss the complaint, various other reasons were asserted for the failure of these petitioners to respond. Petitioner Jiro Kai asserted:

> "I did receive a letter from the Office of Alien Property offering me about 30¢ for my claim. I think I recall being asked to send in my original certificate by registered mail to receive this amount. For me to have done this would have cost more than I was being offered.[6] I had heard from others

---

[6] Counsel for petitioners have supplied us with the following information as to the range in amounts of the claims involved in this litigation: "Of the 1,120 *Honda* claimants who have . . . retained [our associated California counsel] . . . to the present date, the highest is for 120,000 yen—about $30,000 at the *Abe* ratio [or about $332 at the Government's original rate]—and the lowest claim is

that many more persons had claims similar to mine and I understood that they were all being processed together. I saw in the Japanese newspaper that a court suit was or would be filed seeking to obtain for the yen claimants the proper amount for their claims. I believed, therefore, I would be protected."

Other affidavits gave similar reasons. These are summarized best in an affidavit of Mr. Katsuma Mukaeda, president of the Japanese Chamber of Commerce of Southern California:

"Many of the Yokohama Specie Bank yen deposit certificate holders were old people who could not read English and could not understand the communications they received from the Office of Alien Property; many of them had to rely upon other persons who themselves were not able to understand the letters; most of the claimants had never talked to a lawyer about their cases and there was a general feeling in the community that all of the claims were going to be treated alike, both the Sumitomo Bank claimants and the Yokohama Specie Bank claimants; there was knowledge in the community that a law suit had been filed in Washington and it was understood and believed that the outcome of that law suit would determine how much money the claimants received and that it would apply to all claim-

---

for 50 yen, or about $12 [about 14¢ at the lower rate]. Among all 4,100 petitioners the largest debt claimant of which we are aware chose other counsel, and his claim was for 246,000 yen (about $60,000) [about $680 at the lower rate] . . . .

"The average claim among the 1,120 *retainer* claimants in *Honda* is for about $2,000 [at the *Abe* rate], and the mean considerably lower; the average among all 4,100 petitioners is necessarily more modest still, because it includes the 2,980 claimants who have not even sought representation by counsel in this suit, presumably because of the very small amounts of their claims . . . ."

ants not just some; most of the claimants had had experience with or had heard about the Japanese Evacuation Claims program (50 U. S. C. Appx. 1981–1987)[7] and many of them knew generally that under that program, deadlines had been extended and even that the law itself had been changed to include persons who originally were not eligible, to be eligible for repayment of some of their losses due to the Japanese evacuation program, and that persons who previously had been denied payment, later were paid; . . . since the original certificates of deposit were the claimants' only direct evidence of their claim, many of the claimants were reluctant to part with this evidence, especially at a time when the Government was recognizing their claims at less than 2% of their face value, to say nothing of accumulated interest over the years; moreover, many of them felt that to send in their certificates at that time would be taken as agreeing to accept this very small sum in full settlement and they did not want to do that; there were others whose claims were so small that to send in the originals at the figure the Government was offering would net them no return or a very small amount; as individuals, even those claimants who did not have very small claims could not afford to hire an individual lawyer in Washington or to file their own suit but had to rely on what was

---

[7] This legislation, enacted in 1948, authorizes the Attorney General to make awards in amounts not to exceed $100,000 "on any claim by a person of Japanese ancestry against the United States arising on or after December 7, 1941, . . . that is . . . a reasonable and natural consequence of the evacuation or exclusion of such person by the appropriate military commander from a military area in Arizona, California, Oregon, or Washington; or from the Territory of Alaska, or the Territory of Hawaii, under authority of Executive Order . . . ." 70 Stat. 513, 50 U. S. C. App. § 1981.

being done generally and many of them believed that in the end their Government would not try to keep their money but would return it."

The claims of these 4,100 claimants were dismissed when they did not respond within the 45-day administrative limit, pursuant to 8 CFR § 502:25 (g), 21 Fed. Reg. 1582.[8]  Petitioners were notified that their claims were disallowed as abandoned, and told that further proceedings were governed by § 34 (f), the provision requiring a final schedule of claimants and providing for judicial review.  In May 1961 a final schedule was prepared and sent to all claimants, including petitioners.  Petitioners' claims were not included in the schedule, but they were informed that "Pursuant to Section 34 (f) of the Trading with the Enemy Act, as amended, any claimant considering himself aggrieved by this Final Schedule may, within sixty (60) days from the date of the mailing of the Schedule, file in the United States District Court for the District of Columbia a complaint for review of this Schedule . . . ."

Such a suit was brought to challenge the proper rate of exchange.  It was brought by Mr. Kunio Abe, the same person who had challenged the administrative ruling and whose case was cited by the Government in its letters to petitioners as dispositive of their cases.  *Abe* v. *Kennedy*, C. A. No. 2529–61, D. D. C., was held in abeyance

---

[8] The regulation provides: "A claim shall be deemed abandoned when after request to do so the claimant has not furnished relevant information in support of his claim, or where by virtue of his failure to respond to inquiries regarding the claim it appears that he does not wish to pursue it further."  Neither in his motion to dismiss the complaint in the District Court, nor on review in the Court of Appeals and in this Court, has the Attorney General advanced the argument that failure to comply with this administrative regulation is by itself an independent reason for dismissing this suit.  It suffices to say here that such an argument would be open to attack on lines similar to those we hold require tolling the statute of limitations.

in the District Court pending a determination of the identical issue raised in relation to yen certificates issued by the Sumitomo Bank. The District Court upheld the Attorney General's determination, and the Court of Appeals affirmed, *Aratani* v. *Kennedy*, 115 U. S. App. D. C. 97, 317 F. 2d 161, 323 F. 2d 427. After this Court granted certiorari in *Aratani*, 375 U. S. 877, the Attorney General entered into a compromise settlement with the plaintiffs in *Aratani* and *Abe*, in the latter case approximately at the prewar rate without interest.[9] Petitioners here were not included in the class represented by *Abe*, for his complaint was framed to represent only the class of those claimants listed in the schedule rather than all outstanding claimants. Petitioners therefore filed this suit upon final disposition of the *Abe* litigation, and long before the dismissal of certiorari in *Aratani*, asking for similar treatment.[10] The Attorney General denied their claims because petitioners were not included in the class represented in the *Abe* suit, and because they had not filed their suit within 60 days after mailing of the schedule as required by § 34 (f).

## II.

Quite apart from any question of governmental estoppel respecting assertion of the statute of limitations, a contention that is sought to be predicated on the foregoing train of events and circumstances, we consider that the limitations period was in any event tolled during the

[9] The claimants in *Aratani* recovered considerably less than those in *Abe* because the amounts of their claims exceeded the vested assets of the Sumitomo Bank. 228 F. Supp. 706, 708.

[10] The District Court approved the settlements in both *Aratani* and *Abe* on March 18, 1964, 228 F. Supp. 706, and entered its final order on May 18, 1964. The present suit was filed May 19, 1964. The writ of certiorari in *Aratani* was dismissed on March 9, 1965, 380 U. S. 938, upon stipulation of counsel that the case had been settled.

pendency of the *Abe* litigation, and that petitioners' right to bring their suit was not foreclosed. An analysis of the statutory scheme as devised by Congress persuades us, in the context of this factual setting, that this is the result most consistent with the legislative purpose of this Act.

The statutory system embodied in § 34 was intended to provide a method for the fair and equitable distribution of vested enemy assets to American residents. The basic model for the statute was the Federal Bankruptcy Act, a concept revealed in the legislative record by expressions of the Custodian and of those members of Congress principally responsible for the legislation.[11] The 60-day limi-

---

[11] At the committee hearings on this section, the following dialogue occurred between the Chairman, Congressman Celler of New York, and the Custodian, Mr. Markham:

"Mr. MARKHAM. . . . We propose that the law be changed so that the man could file his claim, but he would be paid on a ratable basis, if there is not enough money for everybody, and that we should have a marshaling of assets and a marshaling of debts, so that everybody would be treated alike and would not depend upon the time when they brought the suit or the order in which the suits were brought.

. . . . .

"Mr. CELLER. But you want to be sure that you don't get into a situation where one creditor can fritter away all the assets of an enterprise, and you want to apply them under the principle now applied in the Bankruptcy Act, give each creditor an equitable share in the assets?

"Mr. MARKHAM. That is the way I want it to be done. That is what I want to do." Hearings before Subcommittee No. 1 of the House Committee on the Judiciary on H. R. 5089, 79th Cong., 2d Sess., 17 (1946). See also, *id.*, at 7, 11–13, 113–114.

Congressman Celler used the same reference when he introduced the bill to the House: "The bill before us provides that the Alien Property Custodian takes the property and sells it and divides the proceeds equitably among all creditors as pari passu, in bankruptcy." 92 Cong. Rec. 10217 (1946). And see H. R. Rep. No. 2398, 79th Cong., 2d Sess., 10, 14 (1946); S. Rep. No. 1839, 79th Cong., 2d Sess., 4, 8 (1946).

tation on suits was designed to further this end—to aid claimants by expediting a final distribution—and not primarily as a shield for the Government.

The Bankruptcy Act, the pattern for this legislation, presents a compelling analogy, pointing the way to the decision which we make in this case. Section 57n, 11 U. S. C. § 93 (n), requires notification of claims within six months after the first date set for the first meeting of creditors. Those who fail to file timely claims do not, however, lose all their rights; rather after all duly allowed and properly filed claims have been paid in full, "claims not filed within the time hereinabove prescribed may nevertheless be filed within such time as the court may fix or for cause shown extend and, if duly proved, shall be allowed against any surplus remaining in such case."

It is true that this equitable principle of the Bankruptcy Act was specifically authorized by a 1938 amendment which was "designed to remedy the inequity of returning property to the bankrupt as long as there are creditors, however tardy, whose claims have not been satisfied even in part." 3 Collier, Bankruptcy ¶ 57.33, at 398. But it is noteworthy that bankruptcy courts in the exercise of their general equity power had already reached this result long before the principle was enacted into law. As one *nisi prius* bankruptcy court stated in *In re Lenox*, 2 F. 2d 92, in 1924, "This [the statute of limitations] is a provision for the benefit of creditors, not for the benefit of the bankrupt. . . . In the present case, the provisions of the Bankruptcy Act have been complied with, and those who complied with all its provisions have been paid in full. But the fact remains that the petitioner who had reduced his claim to judgment, the existence and validity of which the bankrupt recognized in his schedules and does not now deny, has received nothing. A fund remains in the hands of the trustee." *Id.*, at 93. The equitable solution, the court held, was to allow the

claim, even though untimely. In *Williams* v. *Rice*, 30 F. 2d 814, an estate, presumably without assets, was reopened when new assets were discovered. The question was again whether creditors who had not filed timely claims should be allowed to prove their claims. Noting that the time limitation· "is intended primarily to require creditors to prove their claims promptly, in order that the estate may be closed without undue delay," *id.*, at 815, the Court of Appeals for the Fifth Circuit held that in the absence of negligent failure to file, claimants in such a case could file after the time limitation. See also *In re Pierson*, 174 F. 160, where the court allowed the reopening of the estate and the filing of claims past the statutory period when new assets were discovered. But see *In re Silk*, 55 F. 2d 917, reaching the opposite result.

Another, though less precise, analogy in the bankruptcy area can be drawn from *Nassau Works* v. *Brightwood Co.*, 265 U. S. 269. The issue there was whether a creditor whose claim was not proved within the statutory period established for creditors in bankruptcy could nevertheless participate in a composition in bankruptcy. Mr. Justice Brandeis, writing for a unanimous Court, analyzed the statute in terms of its purpose and the various interests involved. From the viewpoint of the other creditors, he found, "neither the amount which a creditor receives, nor the time when he receives it, can be affected by the amount of others' claims, or by the time of proof, or by their failure to prove. . . . Nor can the timè of proof of claims, as distinguished from their allowance, be of legitimate interest to the bankrupt. . . . No reason is suggested why Congress should have wished to bar creditors from participation in the benefits of a composition merely because their claims were not proved within a year of the adjudication. Failure to prove within the year does not harm the bankrupt. Why should he gain thereby? And why should

the creditor be penalized by a total loss of his claim?"
265 U. S., at 272–273.

These factors can be applied to the present case with
equal force. What purpose does the strict 60-day lim-
itation serve, except as a method of expediting the dis-
tribution of vested assets to creditors? But no other
creditors are here objecting, for none exist: they have
all compromised their claims and yet a surplus remains
in the account. The Government itself has no real in-
terest in this fund, for it neither comes out of the common
weal nor will any surplus inure to the Treasury. The At-
torney General is a mere stakeholder, a custodian in the
true sense of the word.[12] The only persons who might
eventually benefit from the surplus are those general
beneficiaries of the War Claims Fund into which any
surplus is deposited. But the 60-day rule can hardly
be deemed a device for augmenting this general fund at
the expense of recognized creditors, especially in the face
of repeated and uncontested expressions of congressional
intent to facilitate and expand the rights of American
creditors having an interest in these assets.[13]

---

[12] Under the War Claims Act of 1948, undistributed assets of
enemy property are transferred to a War Claims Fund for distribu-
tion to United States citizens who suffered losses caused by enemy
military operations during World War II. 62 Stat. 1246–1247, as
amended, 50 U. S. C. App. §§ 39, 2012. That Act also declares that
no vested property be returned to the former German or Japanese
owners as had been the case with some assets after World War I.
§ 39 (a). See H. R. Rep. No. 976, 80th Cong., 1st Sess., 2–3 (1947);
H. R. Rep. No. 2439, 80th Cong., 2d Sess. (1948); S. Rep. No. 1742,
80th Cong., 2d Sess. (1948).

[13] See references cited in n. 11, *supra*. There is nothing in the
legislative history of the 1946 Act indicating that Congress had
the interests of those who were in effect "remainder beneficiaries" in
mind when imposing the procedures of § 34. It is further noteworthy
that in 1953 the Congress refused to enact legislation, supported by
the Government, that would have had the effect of wiping out entirely

## III.

The foregoing considerations are especially persuasive here when the reason for petitioners' delay in bringing suit is recalled. It was generally known in the Japanese community that a class suit, the *Abe* case, had been filed in the United States District Court for the District of Columbia. The complaint in that suit outlined the history of the controversy over the proper rate of exchange and it specifically noted that this question was "[t]he sole issue on this complaint for review . . . ." An examination of the complaint, on file at the District Court but presumably not readily available to petitioners who lived on the West Coast, reveals that the plaintiffs included in the class action were defined as those listed on the final schedule rather than all those who filed valid claims. But from a practical standpoint, this definition, which legally excluded these petitioners, made no differentiation between the total group of certificate holders in any material respect. The legal issue raised in the complaint dealt only with the exchange rate; the administrative record filed with the District Court was that of the Abe claim which did apply—at the administrative level—to petitioners; the named plaintiff was also Kunio Abe whose case was cited by the Government as dispositive of petitioners' claims; no action was in any event taken on the complaint which was held in suspense pending determination of the same legal issue in the *Aratani* case and then dismissed upon settlement with the *Abe* suit claimants. Since petitioners filed their claim immediately upon settlement of the *Abe* case, there can be no claim that the course of action they took in any

---

debt claims payable in foreign currency, the Yokohama Bank certificates being the largest group of such debts. See S. Rep. No. 616, 83d Cong., 1st Sess. (1953); 99 Cong. Rec. 7408–7409 (1953).

500

way interfered with the speed or manner in which this litigation was conducted.

. The only arguable difference it might have made had petitioners filed their action immediately upon publication of the schedule is that the Government's willingness to settle the case might have been dampened because the larger number of plaintiffs would have made settlement more costly to the total fund. Upon examination, however, even this possibility should be discounted when it is recalled that these are not in any real sense government funds, but rather vested assets of an enemy debtor which will be distributed to another class of war victims if petitioners' claims are barred. The Government has no interest in the fund except to enforce the primary congressional mandate that bona fide creditors recover their due. Since the amount in the fund adequately covers a full settlement with all these claimants at the *Abe* rate, exhausting the surplus should not have played a part in the Government's decision to settle with the *Abe* claimants.

For these reasons we think the statutory purpose is best served by invoking the equitable doctrine of tolling to preserve petitioners' action in which they seek payment on the same basis as that accorded the claimants in *Abe*.

## IV.

In light of these circumstances we find the Attorney General's arguments unpersuasive. He argues primarily that the doctrine of estoppel does not apply in this case to prevent assertion of the statute of limitations. We do not reach the estoppel issue, because we hold that the statutory scheme itself requires tolling the limitation period during the pendency of the *Abe* litigation. In this respect, the Government contends that because this suit is, at least formally, one against the sovereign, see

*Banco Mexicano* v. *Deutsche Bank*, 263 U. S. 591, the statute of limitations may not be tolled without express congressional consent. It is well settled, of course, that the Government is ordinarily immune from suit, and that it may define the conditions under which it will permit such actions. *E. g., Kendall* v. *United States,* 107 U. S. 123; *United States* v. *Sherwood,* 312 U. S. 584. It is also true that in many cases this Court has read procedural rules embodied in statutes waiving immunity strictly, with an eye to effectuating a restrictive legislative purpose when Congress relinquishes sovereign immunity. *E. g., Kendall* v. *United States, supra; United States* v. *Sherwood, supra; Soriano* v. *United States,* 352 U. S. 270; compare *Crown Coat Front Co.* v. *United States, post,* p. 503.

This case is, however, wholly different from those cases on which the Government primarily relies, where the public treasury was directly affected. Here Congress established a method for returning seized enemy assets to United States creditors, assets that were never contemplated as finding their way permanently into the public fisc. As the House and Senate Reports on this statute declare, "The Custodian has emphasized to the committee that he is anxious to satisfy the proper claims of creditors and the committee concur in the view that there exists a strong moral obligation to satisfy them inasmuch as, but for the vesting of their debtors' property, they would presumably have been able to pursue ordinary remedies against the debtors." H. R. Rep. No. 2398, 79th Cong., 2d Sess., 10 (1946); S. Rep. No. 1839, 79th Cong., 2d Sess., 3–4 (1946). We consider it much more consistent with the overall congressional purpose to apply a traditional equitable tolling principle, aptly suited to the particular facts of this case and nowhere eschewed by Congress, to preserve petitioners' cause of action. *Burnett* v. *New York Central R. Co.,* 380 U. S. 424; cf. *Midstate*

502

*Horticultural Co.* v. *Pennsylvania R. Co.,* 320 U. S. 356, 360.

The judgment of the Court of Appeals upholding the dismissal of this action is therefore reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE CLARK took no part in the decision of this case.