**Mary Christine RULLI, individually and Mary Christine Rulli, as Executrix of the Estate of James E. Rulli, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 82–1497.**

United States District Court, W.D. Pennsylvania, Pittsburgh Division.

March 20, 1984.

Michael J. Macko, Connellsville, Pa., for plaintiffs.

## 1504

Jan Von Flatern, U.S. Dept. of Justice, Washington, D.C., Judith Giltenboth, Pittsburgh, Pa., for defendant.

### OPINION

SIMMONS, District Judge.

This civil action arises out of an airplane crash in which the pilot of a twin engine Piper Aircraft, James E. Rulli, was killed. The resulting wrongful death claim is prosecuted on behalf of the pilot's widow and the estate of the deceased against the United States Federal Aviation Administration (FAA), under the Federal Tort Claims Act (FCTA), 28 U.S.C. § 1346(b) (1976). In short, Rulli contends that governmental negligence caused the crash.

The airplane crash occurred on October 9, 1979, while the pilot was on a flight from the Allegheny County Airport in Pittsburgh, Pennsylvania en route to Connellsville Airport in Fayette County, Pennsylvania. When the accident occurred the pilot was on an instrument flight on approach for landing. An instrument flight, as distinguished from a visual flight, is conducted through the use of cockpit instruments and ground navigational aids.

Through its complaint, Rulli attributes the cause of the airplane crash to alleged defective instruments and navigational aids used in connection with the instrument approach flight and landing of aircraft at the Connellsville Airport. Specifically, Rulli alleges that the pilot's death was the direct and proximate result of the FAA's negligence in the inspection and maintenance of instruments and navigational aids. It is Rulli's contention that the instruments and navigational aids were either defective, non-operational, unreliable or insufficient to assure safe flying conditions. In addition, Rulli argues that the FAA, being charged with the responsibility of regulating navigational aids, had a duty to regulate said navigational aids in a manner so as to foster safe instrument flying conditions.

At an initial pretrial conference of this case the Court granted the parties one-hundred and twenty days to complete discovery. At that time this Court set a pretrial briefing schedule for all pretrial motions. Subsequently, the government filed a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment and Rulli filed the appropriate response.

After hearing the argument of counsel, the Court delayed ruling on the pretrial motions and granted Rulli an additional sixty days of discovery to develop alleged disputed issues of fact. Also, this Court permitted both parties to submit additional briefs, if necessary, in light of this Court's discovery order.

Thereafter, Rulli requested and was granted an additional six week extension of time to conduct and complete discovery. Following the close of discovery, the government renewed its original motions for dismissal and summary judgment. At a subsequent pretrial conference, the parties waived oral argument on the motions and were granted thirty additional days to file briefs. With the exception of the government's renewed motion, to date, no additional pleadings, briefs, or affidavits have been filed following the close of discovery.

As a basis for its Motion to Dismiss and Motion For Summary Judgment, the government contends that under the doctrine of sovereign immunity, Rulli's claims are not actionable and that this Court is accordingly without subject matter jurisdiction. Rulli contends that the government is amenable to suit under the FTCA by virtue of the FAA's regulatory authority over the national airspace system and its duty to inspect navigational aids. Alternatively, the government believes that under the facts of this case it is entitled to judgment as a matter of law. The government also argues that Rulli's complaint fails to state a claim for relief cognizable under Pennsylvania law. This Court need not consider the merits of this latter argument because the case will be disposed of on grounds hereinafter set forth.

As a generally recognized proposition, the United States as a sovereign is immune from suit, except to the extent and according to the terms it consents to be sued.

*See generally, Honda v. Clark,* 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). The extent to which the government has waived sovereign immunity has been spelled out by Congress in the Federal Tort Claims Act, 28 U.S.C. § 2680 (1948). This Act delineates the circumstances under which the government has consented to be sued for the negligent acts or omissions of its agents committed in the scope of their employment. Although under the FTCA the government gave its general consent to be sued in tort, it carved out a number of exceptions to its waiver of immunity. The exception which the government seeks to apply in this case is section 2680(a), which exempts from tort liability:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* at 2680(a).

This provision is commonly called the discretionary function exception because it broadly exempts the government from tort liability in the execution or performance of any discretionary function or duty.

As courts and commentators alike have recognized, there has been a great deal of difficulty in applying the discretionary function exception to a concrete set of facts. *See generally Bernitsky v. United States,* 620 F.2d 948, 951 (3d Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). In the leading Supreme Court case interpreting this provision, the Supreme Court placed significant emphasis on governmental functions entailing policy judgment and decision-making as the key to the exception's applicability. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). There the Court noted that what Congress sought to protect

through immunity was "the discretion of the executive or the administrator to act according to one's judgment of the best course." *Id.* at 34, 73 S.Ct. at 967.

The *Dalehite* case was a wrongful death action resulting from an explosion of ammonium nitrate fertilizer stored in ships. The fertilizer was manufactured and distributed for foreign use pursuant to detailed plans and specifications developed by federal government officials and under the control and supervision of the government. The trial court found that the government was guilty of negligence in the drafting and adoption of plans for production and exportation of the highly explosive substance; in the mandated manufacturing process; and in its failure to police ship-loading of the finish product. *Dalehite,* 346 U.S. at 23–24, 73 S.Ct. at 961–62. The Supreme Court did not disturb the trial court's finding of negligence. But it ruled however, that since each of the acts committed by the government were discretionary in nature, the conduct could not be the basis of liability under the FTCA.

Framing judicial guidelines for determining the boundaries of the discretionary function exception, the *Dalehite* Court declared that:

> [i]t is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that "discretionary function or duty" that cannot form the basis for suit under the Tort Claim Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of the government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 967–68. Under this reasoning, the Supreme Court found that the decisions held culpable by the trial court were committed at the planning level

rather than the operational level and involved considerations of practicability of the Government's program, and as such, were immunized. *Id.* at 42, 73 S.Ct. at 971.

Following *Dalehite* lower courts have drawn varying distinctions in applying the exception. Some courts have focused primarily on the policy judgment aspect, while others have made distinctions between conduct at the planning level and conduct at the operational level. *See Bernitsky,* 620 F.2d at 951. In the Third Circuit, the "litmus test" is "not merely whether judgment was exercised but also whether the nature of the judgment called for policy considerations." *See Griffin v. United States,* 500 F.2d 1059, 1064 (3d Cir.1974).

*Griffin* involved an action brought against the United States for catastrophic injuries sustained from a defective live-virus polio vaccine ingested by the plaintiff. The live virus was administered as part of a program to secure immunization against polio through mass administration of the polio vaccine. Pursuant to federal regulations, the government had a duty to inspect, and did inspect and approve for release the defective batch of vaccine ingested by the plaintiff.

The plaintiff in *Griffin* did not challenge the government's decision to approve a live-virus immunization program nor did he challenge the regulation which established the standard against which the vaccine would be measured. Admittedly, "[t]hese were matters involving balancing of policy considerations in advancing the public interest" and were immune from liability. *Id.* at 1064. The plaintiff's sole challenge was to the manner in which the regulation was implemented, contending that the government failed to comply with federal standards because the neurovirulence exceeded one of five criteria set out in the regulations.

Federal regulations required that a vaccine batch be approved for release only if the neurovirulence of the batch test lot not exceed a certain reference strain and set out five criteria to be considered as evidence of neurovirulence. Although the *Griffin* court interpreted the regulation in a way that would permit the government to weigh the criteria according to its evaluation of how accurately each criterion reflected neurovirulence, as urged by the government, it ruled that such a comparative analysis was an exercise of professional or scientific judgment. Since professional or scientific judgment was not the type of judgment contemplated by the discretionary function exception, the government could be held liable under the FTCA, if it exercised that judgment negligently.

At issue in *Griffin* was a scientific, not a policy-making decision. "It was not the judgment of a policy-maker promulgating regulations by balancing competing policy considerations ...," that was at stake, but the agents responsibility was limited to merely executing policy judgment. *Id.* at 1066.

█ It follows, therefore, that where the tortious governmental conduct involves the execution, implementation or performance of established policies or procedure, a claim will lie under the FTCA. On the other hand, where the tortious conduct involves policy considerations or judgment regarding the nature and scope of a regulatory scheme, the conduct is immunized from judicial review by virtue of the discretionary function exception.

## I.

Rulli's claims in this case are broad challenges to the manner in which the FAA regulated the national airspace system. Upon close scrutiny, it appears that the claims do however fall into two distinct categories. The first category of challenged activity is to the scope of the FAA's regulation of navigational aids, i.e. the standards and regulations developed by the agency to govern the performance of its official duties. The second category of challenged activity is to the manner in which the FAA implemented its regulatory authority, i.e., whether the FAA's actions were consistent with federal regulations.

Rulli's claims falling within the first category are those involving FAA's failure to take corrective measures to remedy alleged

"communication and instrument flight equipment deficiencies" in the radar and radio communications and in the signal strength of the nondirectional beacon at Connellsville Airport. The government contends that any regulatory decision made by the FAA regarding navigational aids, and hence any failures to act in connection with alleged deficiencies, fall within the discretionary function exception to the FTCA.

The navigational aids referred to in this case are facilities used in aid of air navigation, which includes lights, any apparatus or equipment for disseminating weather information, signaling, radio direction location, and radio communication. Navigational aids also include any structure or mechanism for guiding or controlling in flight landing or take-off of an aircraft. A nondirectional beacon (NDB) is a navigational aid which transmits radio signals 360 degrees, similar to an AM band radio station. The signal of a NDB is received by a direction-sensitive antenna in the aircraft which indicates on a cockpit instrument the direction of the NDB. To pick up the NDB signal, typically emitted from an airport, the pilot merely tunes into a designated frequency and follows the heading indicated on his flight instrument.

Rulli vaguely contends that there were problems with the signal strength power of the NDB at the Connellsville Airport.

Rulli's other alleged communication and instrument flight deficiency is that the FAA cannot communicate with aircraft that descend below 3500 feet mean sea level in the Connellsville Airport area. Presumably, Rulli's claim is grounded on the theory that the FAA should have taken additional measures to improve radar and radio communication with aircraft flying below 3500 feet mean sea level in that area.

According to uncontroverted government affidavits, there are a finite number of radar facilities in the national airspace system. These radar facilities are situated at strategic points throughout the country with a view toward serving high density traffic areas. The available radar coverage in the national airspace system varies in direct proportion to the distance from the radar facility and the terrain conditions surrounding the radar facility. For example, the greater the distance from the radar facility, the higher above ground an aircraft must fly to be monitored by radar; also, the more hilly or mountainous the terrain, the higher the aircraft must fly to be monitored by radar.

The airspace surrounding the Connellsville Airport is not a high density traffic area, but rather an isolated area located in a mountainous terrain. The Cleveland Air Route Traffic Control Center in Oberlin, Ohio, provides air traffic control services, i.e., radar and radio communications, to the Connellsville Airport because Connellsville does not have a control tower or radar facilities. Aircraft on instrument flight procedures are cleared for approach to and departure from the Connellsville Airport by the Cleveland Center. Because of the hilly and mountainous terrain surrounding the Connellsville area and because of its distance from the Cleveland Center, reliable radar and radio coverage in the Connellsville area is 5,000 feet mean sea level and above. According to the government's uncontroverted affidavits, minimum altitudes for radar and radio communications at the Connellsville Airport were flight checked by the FAA and confirmed at 5,000 feet mean sea level.

Rulli's claims involving communication deficiencies in navigational aids and the FAA's failure to increase communication efficiency are matters which fall squarely within the discretionary function exception to the FTCA. These claims primarily assail decisions by the FAA regarding the regulation of the national airspace. Such matters involve policy considerations and calls for judgment regarding the scope of the FAA's regulatory scheme and as such are immunized.

For example, Air Route Control Centers, such as the Cleveland Center, provide departure and approach air traffic control services to airports without control towers and radar facilities, such as the Connellsville Airport. Given limited resources and

established traffic patterns, the FAA has chosen to place radar and radio facilities at the locations it believes to be most beneficial to the safe and orderly flow of air traffic. The number of finite radar facilities would have to be increased throughout the national airspace system to provide radar and radio coverage below 3500 mean sea level around the Connellsville Airport.

The decision to increase radar and radio communication coverage, no matter how feasible, is clearly a policy-laden decision and hence not actionable under the FTCA. Decisions turning on the feasibility and practicability of government programs are "matters involving balancing of policy considerations in advancing the public interest." *Griffin*, 500 F.2d at 1064. Where governmental regulatory decisions have involved policy judgments as to what is in the best interest of the public, federal courts have uniformly held such decisions to be immune from judicial review.

For the foregoing reasons, Rulli's claims of radar and radio communication deficiencies are dismissed for want of subject matter jurisdiction. Under the Third Circuit's holding in *Griffin*, the "discretionary function exception" is a jurisdictional bar to Rulli's claims. *Id.* at 1063. *See also Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

## II.

Rulli's second category of claims, involving alleged tortious governmental conduct, is aimed at the FAA's manner of implementing its regulatory authority. Here Rulli's claims are grounded on an allegation that the government was negligent in regards to the frequency and manner of inspections that were performed by the FAA at the Connellsville Airport.

Most navigational aids are federally owned and operated, particularly those located at or near large airports servicing commercial and commuter airlines. Some, however, are owned, operated and maintained by local authorities. The NDB in question in this case is owned, operated and maintained by the Fayette County Airport Authority.

The inspection, maintenance and operation requirements of non-federally owned navigational aids are governed by federal regulations and FAA's internal orders. At the time of the airplane crash in question, non-federally owned navigational facilities were regulated under 14 C.F.R. § 171 (1979). Section 171 of the federal regulations delineates the FAA's responsibilities to operators of non-federally owned and operated navigational aids. To operate a non-federally owned navigational station, under section 171, a private owner must first apply for a license to operate an NDB from the Federal Communication Commission (FCC). When the applicant is granted a license to operate a NDB from the FCC, it must request ground and flight inspections from the FAA. On the basis of an initial ground and flight inspection, the FAA must determine whether the facility satisfies the minimum requirements set out in section 171.25 of the regulations for the commissioning of the facility.

Once a facility is commissioned, the owner "of the facility must establish an adequate maintenance system and provide qualified maintenance personnel to maintain the facility at the level attained at the time it was commissioned." 14 C.F.R. § 171.31(a). The owner must prepare "an operations and maintenance manual that sets forth mandatory procedures for operations, preventive maintenance, and emergency maintenance," 14 C.F.R. § 171.31(b), which must be approved by the FAA. The owner must also submit periodic reports to the FAA regarding the operation and maintenance of its NDB. 14 C.F.R. § 171.33. After a facility has been commissioned, the FAA retains continuing authority to decommission the facility if it ceases to meet the minimum performance, installation or maintenance requirements as provided by federal regulations. 14 C.F.R. § 171.25(b).

With the exception of the initial ground and flight inspection required at the time of commissioning a non-federally owned navigational facility, section 171 prescribes no specific inspection requirements of the FAA. At the time of the aircraft crash which forms the basis of this suit, the

FAA's role in subsequent inspections of non-federally owned navigational facilities was set out in FAA Internal Order No. 6700.10B, which has since been supplanted by FAA Internal Order No. 6700.10C.

Internal Order No. 6700.10B, states that its purpose "is to provide guidance on the ground inspection of non-federally owned navigational aid facilities." It also provides that the NDB facilities "shall be ground inspected at least once annually in accordance with" federal regulations. Internal Order No. 6700.10C, which cancelled Internal Order No. 6700.10B, continued in effect the annual inspection requirement of NDB facilities.

In addition to that required by regulation, the FAA's uncontroverted affidavits indicates that its personnel frequently gave assistance and engineering expertise to owners of non-federally owned navigational facilities, including ground and flight testing in response to complaints about a facilities performance.

Construed broadly in Rulli's favor and reading every favorable inference into the pleadings, Rulli's claims regarding the inspection and commissioning of the non-federally owned navigational facility at Connellsville Airport, are twofold. One, Rulli challenges the frequency of the FAA inspections and two, Rulli challenges FAA's manner of conducting the inspections.

The government contends, and this Court agrees, that the timing and frequency of FAA inspections of non-federally owned navigational aids are matters of policy, calling for determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Certainly, the decision of when and how to conduct inspections that are required by federal regulations are matters which involves considerations of public policy, calling for a balance of such factors as cost of the Government program against the potential benefit. *Griffin*, 500 F.2d at 1064.

In this case, it is important to note that FAA's decision to make annual inspections of NDBs at non-federally owned facilities was made at the planning stage rather than the operational level. Internal Order

No. 6700.10C, which was promulgated by the "Department of Transportation Federal Aviation Administration," provides that the contents of the order shall be "distributed to [the] branch level in Airway Facilities Service, Office of Flight Operations, and Air Traffic Service in Washington headquarters; to [the] branch level in Airway Facilities, Flight Standards, and Air Traffic divisions in regional and areas office; and to all Airway facility sector offices." This manner of distribution suggests a planning level decision to make annual inspections. Such high-level decision-making, while not conclusive, is strong evidence that the decision-making process involved immunized discretionary judgment.

Further, the FAA's internal orders appear to be the direct product of judgment and policy considerations. This can be seen on the face of Internal Order No. 6700.10C. Referring to its predecessor No. 6700.10B, Internal Order No. 6700.10C states that "[a]s a result of [a] review of the program and analysis of inspection findings, it has been determined that schedules can be adjusted for greater economy with no adverse affect on facility performance." Thereafter, the internal order sets out a new inspection schedule.

Against this background, there can be little doubt that the frequency and standard of inspections called for by the FAA, were matters decided at the planning stage and involved the discretionary initiation of programs and activities by the FAA. This type of decision-making process is far removed from a day-to-day perfunctory type task. Thus, to the extent that the complaint can be construed to allege governmental negligence growing out of FAA's promulgation of standards and frequency of inspections, the FAA is immune from liability by virtue of the discretionary function exception to the FTCA. For this reason, these claims must also be dismissed for want of jurisdiction on the authority of *Griffin*.

Such a conclusion, however, does not completely resolve this case. Under the facts of this case, the discretionary func-

tion exception does not immunize liability based on an omission to inspect, where there exists a duty to inspect, or negligence in the actual performance of an inspection, regardless of whether the inspection is required. The exception does not shield the government from liability based on its negligence in licensing, certifying or commissioning; nor negligence premised on the failure to revoke a license, to decertify or to decommission, where a duty exists to do the same. While this Court might conceive of factual circumstances where these sort of activities may involve the balancing of competing policy considerations, and hence may be labeled "discretionary judgment", under the facts of this case, there was no policy weighing discretion involved.

In *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978), the trial court addressed the question of when an inspection would call for discretion that would warrant dismissal under *Griffin*, and when it would not. In *Blessing* employees of private industrial plants sued the government for personal injuries sustained as a result of a negligent inspection conducted by agents of the Occupational Safety and Health Administration (OSHA). There the plaintiffs alleged that OSHA had negligently inspected the plant prior to their injuries and had failed to examine, and hence discover, the defect that caused their injuries.

The *Blessing* court discussed two hypothetical factual circumstances to illustrate the distinction between an inspection involving discretionary judgment and one that did not. In the first hypothetical the court noted that:

> it might be shown that noninspection of the allegedly defective equipment was the result of an authorized decision to limit the scope of inspections due to limitations of manpower, time, or the like. Such decisions establishing priorities would likely be found to be discretionary in nature ... because enforcement decisions along these lines would involve balancing policy considerations—e.g., given limited resources, whether to conduct spot inspections at many plants or comprehensive inspections at just a few. [T]hese sorts of decisions would directly affect the feasibility or practicability of the government's inspection program....

*Id.* at 1178–80 (footnotes omitted). The *Blessing* court believed that such decisions required considerations that were primarily political, social and economic in nature and were not the type of determinations that courts are permitted to scrutinize under negligence standards.

In its second hypothetical, the *Blessing* court went on to point out that, on the other hand:

> [i]t is possible that policy decisions were made to inspect the equipment ... or ... the instructions under which the inspectors operated might not have been such that as a non-policy professional matter it would have been negligent to omit inspections of the equipment. Indeed, it is conceivable that "discretion" was permitted in structuring the inspections, but that it was *professional* discretion; that is, discretion to examine only those things that would be considered, as a professional matter and under objective standards, more likely to cause injury.

*Id.* at 1184–85 (original emphasis). The *Blessing* court opined that the latter scenario would be factually similar to *Griffin* because failure to inspect the equipment would not have been grounded in an authorized policy decision. The decision not to inspect would not have gone to the feasibility or practicability of the program. Therefore, judicial review of the noninspection would not affect the programatic ability of the government to structure inspections according to its evaluation of the "best course," and the omission could be reviewed under judicially manageable standards of due care and reasonableness.

Under the second hypothetical, *Griffin* would not authorize dismissal because judicial review would not intrude on policy judgments made by the executive branch of government. The *Blessing* court denied the governments dismissal motion, as premature, to permit the plaintiff an opportunity to develop facts during discovery that would support jurisdiction under the FTCA.

A similar disposition, however, is not required in this case. On the basis of the record, this Court holds as a matter of law that the discretionary function exception to the FTCA is not a jurisdictional bar to Rulli's claim that the FAA negligently omitted—or negligently performed—inspections of the navigational aids at the Connellsville Airport.

This Court's holding on this point is premised on the nature of the inspections performed by the FAA. The only regulatory requirement that the FAA inspect non-federally owned navigational facilities is during the commissioning stage. As noted earlier, FAA's internal orders require the agency to conduct annual inspections of non-federally owned NDBs. Whether the FAA's internal order, *sua sponte*, creates a duty to inspect running to third parties and enforceable in tort actions under Pennsylvania law, this Court need not consider. The question of whether subject matter jurisdiction exists is separate and distinct from the question of whether a valid cause of action has been pled. Here, this Court decides the jurisdictional question and leaves the pleading question for another day.

For jurisdictional purposes it is significant indeed that the FAA's internal orders require yearly inspections, because the critical inquiry is whether the decision to inspect involved the exercise or performance of a discretionary function or duty. The short answer is no. True, the inspection of navigational aids involved the exercise of judgment, but the evaluative judgment had no policy-weighing components. The exercise of judgment by the FAA inspectors involved professional or scientific, rather than policy-oriented judgment; the type of judgment the *Griffin* court believed it was fully capable of scrutinizing by the usual standards applied to other negligence cases.

On the basis of the pleadings in this case, an alleged noninspection of navigational aids would not involve an authorized decision to limit the scope of inspections because of manpower, time or the like. This is because Rulli's theory is grounded on default due to oversight, caprice or some other non-policy consideration of the individual inspectors, as distinguished from considerations based on limited resources or curtailment of the scope of the inspection program.

Here again, the level at which the "judgment" was exercised is important in determining the nature of the judgment and whether it called for policy considerations. Here, a decision to forgo inspections made at the planning level of the FAA is properly immune from liability, while the same decision made by an inspector at the operational level is accorded no protection from an allegation of negligence.

Under this analysis, this Court concludes that noninspection through oversight or an inspector's conscious decision not to inspect, is reviewable under the FTCA. The government does not argue to the contrary nor need there be any protracted analysis to conclude that negligence in the performance of an inspection is actionable under the FTCA. *See Bernitsky v. United States*, 620 F.2d 948, 952 (3d Cir.1980). To accept the proposition that negligent inspections by government agents who fail to discover dangerous conditions causing harm to others is actionable, is to accept, *a fortiori*, the proposition that noninspection, which would or reasonably should have led to a discovery of the same dangerous condition, is equally actionable. To conclude otherwise would run afoul of the common experience of man and tend to undermine the policy of inspections for public safety. If this were not the rule, those charged with the responsibility of performing inspections to ensure public safety would be encouraged to forgo inspections for fear that their oversight may give rise to a tort action which could have otherwise been easily avoided by simply not inspecting. The policy behind tort liability premised on faulty inspections is to encourage the inspector to use reasonable care, not to discourage the inspection.

This Court's analysis and conclusion that FAA's inspections of navigational aids are jurisdictionally reviewable under the FTCA, is equally applicable to the FAA's

decision to commission or decommission a non-federally owned facility. Federal regulations set out a series of minimum requirements that must be met before the FAA is permitted to approve for operation a non-directional radio beacon facility used in instrument flight rules procedure. *See* 14 C.F.R. § 171.25. If an applicant for approval meets the six requirements of section 171.25(a), the FAA is authorized to commission the facility as a prerequisite to its approval for use in instrument flight rules procedure. The FAA approval is withdrawn any time a facility ceases to meet those requirements. *Id.* at § 171.-25(b).

Any challenge to the sufficiency of the minimum requirements for commissioning a non-federally owned facility as provided by federal regulations is without question barred by virtue of the discretionary function exception. As heretofore held, a challenge to the standards and regulations developed by an agency to govern the performance of its official duties is not cognizable under the FTCA. *See generally George v. United States,* 703 F.2d 90 (4th Cir.1983) (challenge to FAA's standard permitting brass and fuel pickup not actionable); *Garbarino v. United States,* 666 F.2d 1061 (6th Cir.1981) (FAA's failure to require crashworthiness test prior to certification not actionable); *Baird v. United States,* 653 F.2d 437 (10th Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982) (challenge to adequacy of government-drawn aeronautical charts not actionable).

However, a claim predicated on the failure of the FAA to comply with federal regulations is not barred by the discretionary function exception, where noncompliance at the operational level is the alleged negligence. This is the precise reasoning and holding of the *Griffin* court, which held actionable the government's disregard of an established regulatory command. As the *Griffin* court noted:

> [I]iability ... is predicated not on a negligent or unwise policy determination, but on the failure of the Government employees to conform to and act consistently with authority delegated. We do not

hold that the government may be liable for policy determinations made by its officials. Rather, we hold that the Government may be liable where its employees, in carrying out their duties, fail to conform to pre-existing statutory and regulatory requirements.

*Griffin,* 500 F.2d at 1069.

Thus, a claim that the FAA failed to decommission the NDB facility at the Connellsville Airport, consonant with the dictates of federal regulations, is subject to judicial review under the FTCA. The same would hold true if the FAA commissioned the facility in violation of the regulatory requirements. Under the authority of *Griffin,* liability is grounded on the government's failure to act within the scope of its delegated authority. Therefore, this Court holds that Rulli's negligence claims grounded on FAA's failure to inspect or commission navigational aids at the operational level consistent with federal regulations is not barred by the discretionary function exception and this Court has jurisdiction to consider these claims under the government's Motion For Summary Judgment.

### III.

In addition to the dismissal motion under F.R.C.P. 12(b)(1), for want of jurisdiction, the government has also requested summary judgment under F.R.C.P. 56. In view of the procedural posture of this case, the affidavits and accompanying exhibits submitted with the government's motion, and Rulli's failure to raise any genuine and material disputed issue of fact, the Motion for Summary Judgment is ready for disposition.

Consequently, Rulli's claims that have survived the government's dismissal motion for want of jurisdiction up to this point, are now ripe for consideration under Rule 56. The government has submitted uncontroverted affidavits and documents establishing that the FAA performed the pre-commissioning inspection of the Connellsville Airport according to the requirements of section 171 of the federal regulations, and each of the annual inspections

required by FAA Internal Order No. 6700.-10B. Furthermore, the annual ground and flight inspection report forms, which are attached to the government's motion as exhibits, indicate that the navigational facility in question was satisfactory for air navigation according to federal standards. Although granted ample opportunity, Rulli has submitted no counter-affidavits controverting the governments averments.

In this regard it is important to note that after substantial opportunity to do so, Rulli has proffered no evidence, by way of affidavits, documents, or through its discovery materials, that the FAA performed its duties negligently, inconsistent with federal regulations or otherwise outside the scope of its delegated authority.

As noted at the outset of this opinion, the parties were originally granted one-hundred and twenty days within which to conduct discovery. At the argument on the government's motion, this Court informed the parties that it would delay its ruling to grant Rulli additional discovery time to develop asserted issues of disputed fact, which may warrant denial of the government's motion. At that argument the following colloquy occurred:

> [PLAINTIFF]: First of all, addressing the issue of whether the inspections were done non-negligently, I don't think the fact affidavits have been submitted saying inspections were done is proof in and of itself that they were done in a non-negligent manner. They could have been perfunctory, overview inspections.
>
> . . . .
>
> COURT: [A]t this stage of the proceeding, do you have any known evidence that the inspections were done negligently. . . .
>
> [PLAINTIFF]: No. I think that can be developed through discovery, Your Honor, as to what was performed in each phase of the investigation or the inspection. . . .
>
> COURT: In other words, you are saying that that's a disputed issue of fact?
>
> [PLAINTIFF]: I believe it is, Your Honor, the manner in which the inspections were carried out, the history of this non-directional beacon.
>
> . . . .
>
> COURT: Suppose we gave you time for discovery and then the events would indicate reasonably that there was in fact as far as you can prove no evidence of negligence. Then you would be candid enough to come forward and say, "We have discovered ... and we find that there is no evidence whatsoever that we can establish that some sort of a negligent act of omission or commission ... on the part of the government which would warrant a jury to find negligence in this case."
>
> [PLAINTIFF]: I would be so candid, Your Honor.

*See* Transcript of Record, July 14, 1983 at 15–16.

Following the close of discovery, the government renewed its motion. Rulli, however, has submitted no additional pleadings, no affidavits or has otherwise demonstrated the existence of a genuine and disputed issue of fact, other than counsel's verbal averments at the oral argument. Thus, on the record before this Court and in the interest of judicial economy and substantial justice, this Court has no alternative but to grant the government's Motion for Summary Judgment because there is no evidence in the record which raises an issue of disputed fact as to the government's negligence in the performance of its duties. To the contrary, the undisputed evidence establishes that the FAA performed its duties properly and in accordance with federal regulations.

Accordingly, the government's Motion for Summary Judgment is granted.