948 F.2d 1057
 Marvin MANYPENNY, Margaret Norcross, Seraphine Rock,
Theodore Hoagland, Leroy Nelson, George McDonald, Dorothy
Brown, John Brown, Maggie Weaver, Winona LaDuke, Sun Bear
(a/k/a Vincente LaDuke), Shirley LaDuke, Clifton LaDuke,
George Peake, Jr., David Peake, Lesley Bellecourt, Fred
Weaver, Earl Peabody, Maji Gabo, a/k/a Laverne Boswell, John
Bush, Harry Kettle, Albert Murray, Luella B. Morrison
Hulbert, and George Fineday, Sr., Appellants,
and Norma Koenen, individually, and on behalf of all others
similarly situated,
v.
The UNITED STATES of America, the United States Department
of Interior, Donald Hodel, in his official capacity as
Secretary of the Interior, Ross Swimmer, in his official
capacity as Assistant Secretary of the Interior for Indian
Affairs; State of Minnesota, County of Becker, County of
Clearwater, County of Mahnomen, Thomas Triplett,
Commissioner of Revenue, State of Minnesota, individually
and in his official capacity, Ernest E. Kretzschmar, Harold
Nystrom, Elizabeth Nystrom, Albin Scherping, S.E. Mooers,
Violet J. Schroeder, Samuel Gladdig, Frances Johnson, L.G.
Everest, Inc., Leslie M. Hanson, Waubaun School District #
435, Allan Aanerud, Arnold Basted, Douglas Kramer, Joan
Kramer, Richer Swierr, Agnes Swierr, A.J. Wambach, Jr.,
Beryl Wambach, Brian M. Elliott, Veronica M. Elliott, Appellees,
Gerald Fleming, Susan J. Fleming,
Robert G. McGregor, Jacqueline McGregor, John Doe and Mary
Roe, current and past holders or claimants to lands on the
White Earth Indian Reservation properly belonging to
Plaintiffs and members of the respective classes they
represent, Appellees.
George FINEDAY, Sr., Fred Weaver, Melvin Buckanaga, Sr.,
John Gwinn, Hank Smith, Freda Higman, Marvin Manypenny,
Sullivan Adams, Hazel Arthur, Karen Manypenny, Dorothy
Brown, Bernice Buckanaga, Hazel Aitkin, Sally Lu Littlewolf,
Appellants,
v.
The UNITED STATES of America, the United States Department
of Interior, Donald Hodel, individually and in his official
capacity as Secretary of Interior, Ross Swimmer,
individually and in his official capacity as Assistant
Secretary of the Interior for Indian Affairs, State of
Minnesota, County of Becker, County of Clearwater, County of
Mahnomen, Thomas Triplett, Commissioner of Revenue, State of
Minnesota, individually and in his official capacity, T.P.
Kremer, William Sheeler, Oscar Peterson, Gerald Fleming,
Carol Fleming, A. Roger Viker, R.D. Malmo, Edward Trautner,
Leona Trautner, St. C. Lister Co., John Donley and Glenice
Donly, and John Doe and Mary Roe, current and past holders
or claimant to lands on the White Earth Indian Reservation
properly belonging to Plaintiffs and members of the
respective classes they represent, Arnold Blazer, Marion J.
Pederson, Theodore E. Dubois, Arthur E. Erickson, Gwendolyn
Erickson, Ralph C. Kunze, Adryn Sponberg, James B. Hull,
Muriel A. Hull, Paul Stalberger, Joann Stalberger, Raymond
Brtek, Lawrence Osenga, Diane Osenga, Appellees.
 No. 90-5480.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 13, 1991.
Decided Oct. 29, 1991.
Rehearing and Rehearing En Banc
Denied Dec. 17, 1991.
 
 Kurt V. BlueDog, Bloomington, Minn., argued (Edward M. Peterson, Jr., on the brief), for appellants.
 Mary E. Carlson, Minneapolis, Minn., argued (Jerome G. Arnold, on the brief), for appellee U.S.
 William A. Szsotkowski, St. Paul, Minn. (Hubert H. Humphrey III, Jerilyn K. Aune, on the brief), for appellee State of Minn.
 Nancy Wiltgen Reibert, Minneapolis, Minn., argued (Charles K. Dayton, on the brief), for appellee Becker, et al.
 Wayne P. Dordell, St. Paul, Minn., argued, for appellee Wambach, et al.
 Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Marvin Manypenny and George Fineday, Sr., as the first-named plaintiffs in two consolidated lawsuits brought by a total of thirty-five enrolled members of the White Earth Band of Chippewa Indians appeal from judgments entered against them on motions to dismiss. The lawsuits seek to quiet title on behalf of certain Indians or their heirs to property currently possessed by others. The plaintiffs seek declaratory, injunctive and monetary relief, and also allege civil rights violations, intentional torts, and negligence. The district court[1] concluded that Manypenny and Fineday failed to establish that the federal court had jurisdiction over their claims against the United States, its agencies and officials in their official capacity, the State of Minnesota, and its Commissioner of Revenue. Manypenny v. United States, No. 486-770, slip op. at 32 (D.Minn. Feb. 16, 1988). The district court concluded that other claims against state and federal officials in their individual capacities were barred either for failure to state a claim upon which relief could be granted or by absolute or qualified immunity.[2] Id. In a second order, the district court dismissed claims against three Minnesota counties and individual landowners because an indispensable party, the United States, had been dismissed earlier from the lawsuit and could not be joined. Manypenny v. United States, 125 F.R.D. 497, 502-03 (D.Minn.1989). On appeal, Manypenny and Fineday argue that: (1) the White Earth Reservation Land Settlement Act of 1985, Pub.L. No. 99-264, 100 Stat. 61 (1986), known as WELSA, waived the federal government's sovereign immunity, (2) the State of Minnesota waived its eleventh amendment immunity by participating in WELSA, and (3) the counties and individual defendants were improperly dismissed on the basis that the United States is an indispensable party to the action. We affirm the judgment of the district court.
 
 
 2
 The Manypenny and Fineday plaintiffs assert approximately 40 claims involving title and possessory interests in 4,087 acres of land in Becker, Clearwater, and Mahnomen counties in Minnesota, all within the White Earth Indian Reservation. A brief history of the disputed land, largely tracing transactions, public policies, and government enactments of the late 1800s and early 1900s, is helpful in understanding the context in which this appeal arises.
 
 
 3
 Several bands of Chippewa Indians originally owned the land comprising the White Earth Reservation. Through a series of treaties culminating in the treaty of March 19, 1867, the Chippewas ceded an estimated two million acres in exchange for payments and the promise that a reservation would be created for their permanent use and occupation. 16 Stat. 719-23 (1867). Twenty years later, the General Allotment Act, 24 Stat. 388 (1887), established the national policy of breaking up tribal reservations by allotting parcels of reservation land to individual Indians and permitting the land not used for such allotments to be sold to non-Indians. In 1889, the Nelson Act, 25 Stat. 642 (1889), applied the allotment policy to the White Earth Reservation, which then covered thirty-six townships and 830,000 acres. Under the Act, each full- or mixed-blood allottee received a trust patent under which the United States would hold the allotted land in trust for twenty-five years before conveying the title in fee to the allottee. During the trust period, each allotment would be tax-exempt and could not be alienated or encumbered without the approval of the Secretary of the Interior.
 
 
 4
 Over nearly twenty years, the government issued about 8,000 allotments. Executive orders signed in 1927, 1932, and 1933 extended the trust periods on most White Earth tracts. The Indian Reorganization Act of 1934, 48 Stat. 984 (1934) (codified at 25 U.S.C. § 462 (1988)), extended indefinitely all trust periods then in existence.
 
 
 5
 By the 1930s, however, most of the allotted land had already been sold, lost through forfeiture, or otherwise alienated. The Clapp Amendment, enacted in 1906, 34 Stat. 325, 353 (1906), purported to remove all restrictions on the sale of land allotted to adult mixed-blood Indians at the White Earth Reservation.[3] The Clapp Amendment and conflicts over its proper interpretation led to the many disputed land transactions underlying this lawsuit.
 
 
 6
 In Baker v. McCarthy, 145 Minn. 167, 176 N.W. 643 (1920), the Minnesota Supreme Court interpreted the Clapp Amendment as terminating the trust relationship and conveying the fee title to mixed-blood allottees. Id. 176 N.W. at 644. In Morrow v. United States, 243 F. 854 (8th Cir.1917), however, this court held that the Clapp Amendment could not unilaterally terminate the relationship created by the trust patents because the government, in its dealings with the Indians, may "create property rights which, once vested, even it cannot alter." Id. at 856. Under Morrow, the trust relationship continued until the mixed-blood allottees applied for title in fee simple, and the land was not taxable or alienable before that time. Id. at 858. Under McCarthy, however, the allotments of mixed-blood Indians could be freely taxed, mortgaged or sold without the federal government's consent. McCarthy, 176 N.W. at 644.
 
 
 7
 In the years immediately following its passage, the Clapp Amendment resulted in the transfer of most of the White Earth land to private parties. H.R.Rep. No. 99-489, 99th Cong., 2d Sess. 1, 2-3 (1986). Reservation land holdings plummeted from approximately 830,000 to 57,000 acres. While many of the White Earth allotments were sold or mortgaged by mixed-blood Indians, some were alienated by full-blood Indians. In addition, the purported loss of tax-exempt status allowed state and local governments to begin taxing the allotments, many of which were later lost through tax forfeitures. Morrow voided these forfeitures and cast doubt upon the validity of many of the land transfers that occurred between 1906 and 1917. During a brief period of enforcement of the trust patents between 1910 and 1920, the Department of Justice brought suit on behalf of the Indians and most of the sales by full-blood allottees were voided. The Department of Justice's efforts ceased thereafter, despite the successive extensions of the trust period by the President and Congress.
 
 
 8
 In 1919, the Department of the Interior added to the confusion when it began issuing fee patents to adult mixed-blood allottees without application and before the expiration of the trust period. This practice continued for about four years under the authority of the Burke Act, 34 Stat. 182 (1906), which amended the General Allotment Act by permitting the Interior Secretary to issue the fee patent when he deemed an allottee to be capable of managing his own affairs. In most cases, the recipient of the patent had already sold or mortgaged the land.
 
 
 9
 The validity of many of the land transactions went unchallenged until the Minnesota Supreme Court decided Minnesota v. Zay Zah, 259 N.W.2d 580 (Minn.1977), cert. denied, 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978), in which it held that the vested rights of adult mixed-blood allottees included not only immunity from taxation, but also continuation of the trust status for the land unless the allottee requested termination. Id. at 589. The court held that the Indian Reorganization Act of June 18, 1934 (codified at 25 U.S.C. § 462 (1988)), indefinitely extended the tax immunity by continuing the trust period beyond the first twenty-five years until Congress provided otherwise. Id. at 587-89. The Zay Zah court invalidated a purported tax forfeiture of an allottee's property, and determined that equitable title to the property passed to the heirs with fee title remaining with the United States until the heirs applied for a fee patent. Id. at 589.
 
 
 10
 Following Zay Zah, the Department of the Interior concluded that any transfer of an allotment without an allottee's consent was invalid. Beginning in 1979, the Department's Bureau of Indian Affairs sent hundreds of letters to current owners of tracts whose history indicated that the land had originally been alienated through a tax forfeiture, a sale or mortgage by a minor allottee, a sale by a full-blood allottee, a mortgage foreclosure, or state probate proceeding. The letters advised the landowners of potential claims to their land and stated that Interior would request that the Department of Justice file suit on behalf of Indians whose land was illegally appropriated.
 
 
 11
 After Congress passed the Indian Claims Limitation Act of 1982, 96 Stat. 1976 (1982), which directed that a formal list of all previously identified claims be published in the Federal Register, more than 1,700 White Earth allotments were listed under the Act. As a result, titles to more than 100,000 acres of land in Becker, Clearwater, and Mahnomen counties were clouded because of transfers that, for the most part, had occurred decades ago. Although the Justice Department never filed any of the lawsuits, the potential for legal action created social and economic chaos.
 
 
 12
 To restore some order, Congress passed WELSA on March 24, 1986. 100 Stat. 61 (1986). Through WELSA, Congress attempted to settle claims to tracts falling into one of twelve types of title histories. See id. §§ 4(a), 4(b), 5(c). WELSA settled titles by retroactively ratifying land transactions, extinguishing claims, and authorizing compensation to original allottees or their heirs from whom title was taken or transferred. Id. §§ 6, 8. The Act also set up procedures for determining entitlement to compensation and the amount of payment. Id. § 8. It further authorized a $6,600,000 grant to the White Earth Band, and required the State of Minnesota to donate 10,000 acres of land to the United States to be held in trust for the Band and to contribute $500,000 to the Department of Interior for technical assistance. Id. § 10. WELSA recognized that the allottee or heir might choose to file an action in federal district court seeking to recover title to an allotment, or damages in lieu of the statutory compensation.[4] Id. § 6(c). Bringing suit, however, extinguishes any rights that an allottee or heir might have to compensation under WELSA. Id. Manypenny and Fineday acknowledge that as a result of their suit, they are ineligible for monetary relief under the framework established in WELSA. The District of Columbia Circuit upheld WELSA as constitutional in Littlewolf v. Lujan, 877 F.2d 1058, 1066 (D.C.Cir.1989), cert. denied, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 832 (1990).
 
 
 13
 Congress adopted WELSA over the objections of the Minnesota Chippewa Tribe and the White Earth Reservation Business Council. In October 1986, the Manypenny plaintiffs, then twenty-two, filed suit both as individuals and as a proposed class. In January 1987, they filed an amended complaint listing twenty-five plaintiffs. The district court later denied class certification. Manypenny v. United States, No. 4-86-770, slip op. at 23-24 (D.Minn. June 23, 1987). The fourteen Fineday plaintiffs, who did not seek class status, filed suit in January 1988.[5] The district court considered the two cases separately, but they were consolidated for this appeal, based on common legal questions.
 
 I.
 
 14
 Manypenny and Fineday contend that Congress affirmatively and expressly waived the federal government's sovereign immunity in various sections of WELSA and established a independent cause of action for allottees or their heirs seeking return of the land and monetary damages. Although Manypenny and Fineday claim that they relied on WELSA "throughout" the proceedings in the district court, evidence of that reliance does not appear in the record. They made no reference to WELSA in their complaints and did not argue when opposing the motion to dismiss in the district court that WELSA waived the government's sovereign immunity. As a consequence, the district court has not passed on the arguments now raised by Manypenny and Fineday.
 
 
 15
 Manypenny and Fineday point out that they opposed the enactment of WELSA and continue to oppose the Act's provisions which divest them and other members of the White Earth Band of any interest in the disputed property. While we fully appreciate Manypenny's and Fineday's objections to WELSA, we are deeply troubled by their express reliance on WELSA in this court after they consistently took the position before the district court that they were not relying on WELSA. In fact, the plaintiffs' pleadings and arguments in the court below suggest that they were, in fact, attempting to avoid the impact of WELSA. The district court, in denying class certification to the Manypenny plaintiffs, implicitly observed as much.[6]
 
 
 16
 We have often stated that we do not consider issues not passed on by the lower court. Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); Ozark Restaurant Equip. Co. v. Anderson, 850 F.2d 342, 346 (8th Cir.1988); Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir.1986). We thus can affirm solely on the ground that Manypenny and Fineday did not raise the applicability of WELSA in the district court and may not do so now in this court.
 
 
 17
 The rule we have cited above does permit an exception when the obvious result would be a plain miscarriage of justice or inconsistent with substantial justice. Morrow v. Greyhound Lines, Inc., 541 F.2d 713, 724 (8th Cir.1976). We do not address whether this exception applies here, for we nonetheless believe it is desirable to address whether WELSA authorizes the claims asserted by Manypenny and Fineday.
 
 II.
 
 18
 Congress intended WELSA to settle with finality specified "unresolved legal uncertainties" arising out of clouded titles to allotted lands on the White Earth Indian Reservation. WELSA, § 2(6). WELSA achieves its solution by retroactively ratifying the transfers of White Earth land, extinguishing all claims based on those transfers subject to the provisions of the Act, and by authorizing compensation to allottees and heirs.
 
 
 19
 Manypenny and Fineday argue, however, that Congress expressly provided for an independent cause of action under WELSA as an alternative to accepting claim settlement and compensation under the Act. They contend that section 6(c) provides for this "election of remedies" by recognizing that an allottee may file a court action to "recover title or damages" and by stating that "[a]ny such action filed within the time period allowed by this subsection shall not be barred...."
 
 
 20
 Manypenny and Fineday assert that Congress, in enacting section 6(c), "gave notice to appellants that they could file a lawsuit in federal district court" if they chose to forego compensation under WELSA. They further contend that Congress cleared the way for such an action by expressly removing the barrier of sovereign immunity. Manypenny and Fineday argue that the waiver of sovereign immunity in section 6(d), although appearing restricted to actions challenging the constitutional adequacy of compensation, can be interpreted as extending to any action brought under WELSA, including those brought under section 6(c). Manypenny and Fineday further argue that section 6(c), when read in conjunction with sections 6(a) and 6(b), also provides a waiver of sovereign immunity.
 
 
 21
 It is undisputed that the United States, as a sovereign, cannot be sued without its consent. United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); Harris v. United States, 841 F.2d 1097, 1100 (Fed.Cir.1988). The consent must be expressed unequivocally and cannot be implied. Harris, 841 F.2d at 1100. See also Murray v. United States, 686 F.2d 1320, 1325 (8th Cir.1982), cert. denied, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). The waiver of sovereign immunity requires consent as to the particular tribunal that is to exercise jurisdiction. Harris, 841 F.2d at 1100. Moreover, a substantive basis must exist for the government's liability. Id; see also Mitchell, 463 U.S. at 216-19, 103 S.Ct. at 2967-69. Courts are not free to extend or restrict waivers of sovereign immunity beyond what Congress intended. United States v. Kubrick, 444 U.S. 111, 117-18, 100 S.Ct. 352, 356-57, 62 L.Ed.2d 259 (1979). The terms of the congressional waiver establish the parameters of the court's subject matter jurisdiction. See United States v. Orleans, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976); Honda v. Clark, 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967); United States v. Sherwood, 312 U.S. 584, 591-92, 61 S.Ct. 767, 771-72, 85 L.Ed. 1058 (1941).
 
 
 22
 It is against these precepts that we must evaluate Manypenny's and Fineday's claim that WELSA waived the federal government's sovereign immunity. Before we address the substance of their argument, we briefly summarize the relevant provisions of the Act.
 
 
 23
 WELSA provides for three different types of legal action. Section 6(d) states that any person entitled to compensation shall not be barred from maintaining an action under the Tucker Act challenging the constitutional adequacy of WELSA's compensation provisions as applied to a particular allotment or interest. Section 6(d) bars "such an action" if it is not filed with the Claims Court within 180 days following the issuance of the notice of the Secretary's compensation decision. Section 6(d) then adds: "The United States hereby waives any sovereign immunity defense it may have to such an action, but does not waive any other defenses it may have to such action." (Emphasis added).
 
 
 24
 The second type of action is the review of the Secretary's administrative determination of the amount of compensation. Section 8(d) states that such an action must be brought under the Administrative Procedure Act in the District Court of Minnesota within 180 days after the issuance of the notice of compensation.
 
 
 25
 Section 6(c), which addresses the third type of action, states that any action in any court seeking to recover title or damages with respect to the transactions ratified by WELSA must be filed within 180 days following enactment of WELSA or prior to the Secretary's statement in the Federal Register certifying that certain conditions necessary to the implementation of WELSA have been met.[7] Section 6(c) then states:
 
 
 26
 Any such action filed within the time period allowed by this subsection shall not be barred; however, the filing of any such action by an allottee, heir, or others entitled to compensation under this Act shall bar such allottee, heir or others from receiving compensation pursuant to the provisions of section 8. The United States District Court for the District of Minnesota shall have exclusive jurisdiction over any such action otherwise properly filed within the time allowed by this subsection.
 
 
 27
 Manypenny and Fineday do not argue that section 8(d), which permits judicial review of the Secretary's determination of the amount of compensation, contains a waiver of sovereign immunity as to any action filed under WELSA. They do assert, however, that the explicit waiver of sovereign immunity contained in section 6(d) is not limited to actions challenging the constitutional adequacy of compensation under the Tucker Act, but can be construed to apply to any action brought under WELSA. Section 6(d) states:
 
 
 28
 This section shall not bar an heir, allottee, or any other person entitled to compensation under this Act from maintaining an action based on the transactions described in section 4(a), 4(b), 5(a), or 5(c), against the United States in the Claims Court pursuant to the Tucker Act, section 1491 of Title 28, United States Code, challenging the constitutional adequacy of the compensation provisions of section 8(a) as they apply to a particular allotment or interest: Provided, That such action shall be filed with the Claims Court not later than one hundred and eighty days after the issuance of the notice of the Secretary's compensation determination as provided in section 8(c). If such an action is not filed within the one-hundred-and-eighty-day period, it shall be forever barred. The United States hereby waives any sovereign immunity defense it may have to such an action but does not waive any other defenses it may have to such action. The filing of an action by any heir, allottee, or any other person under the provisions of this section shall bar such person forever from receiving compensation pursuant to the provisions of section 8.
 
 
 29
 (Emphasis added.)
 
 
 30
 Specifically, Manypenny and Fineday assert that the reference in the last sentence of section 6(d) to the "filing of an action ... under the provisions of this section ..." also refers to actions allowed under section 6(c)--the section that they contend permits a suit under WELSA to recover title or damages. Taking their argument a step further, they state: "Arguably, the explicit waiver language [of 6(d) ] was [also] meant to apply to the district court actions allowed under subsection (c)" as well as to suits under 6(d). Manypenny and Fineday concede that such an interpretation of 6(d) departs from the more obvious meaning of that subsection. They fall back on their contention that "[t]he drafters of WELSA were not especially clear in their wording of certain provisions."
 
 
 31
 In essence, Manypenny's and Fineday's argument collapses of its own weight. A waiver of sovereign immunity must be clear, express, and unequivocal. An argument resting on the admission that the waiver language is not "especially clear" carries little persuasive force. Although the last sentence of 6(d) may indeed have relevance to the other subsections of section 6, this relationship is not strong enough to bear the weight placed on it by Manypenny and Fineday. The sentence in subsection 6(d) waiving sovereign immunity is specifically addressed to actions brought under the Tucker Act as provided for in 6(d), and the last sentence cannot be read to expand the clearly enunciated scope of the waiver.
 
 
 32
 Manypenny and Fineday next argue that sections 6(a), 6(b), and 6(c), when read together, create a clear waiver of the federal government's sovereign immunity. Section 6(a), which retroactively "approves and ratifies" the land transactions covered by statute, states that the ratification is "subject to the provisions of section 6(c)." Section 6(b), which extinguishes all claims arising from the land transactions retroactively ratified, states that the extinguishment is "subject to the provision of this Act."
 
 
 33
 Manypenny and Fineday rely on the above-quoted language along with the statement in section 6(c) that "[a]ny such action filed within the time period allowed by this subsection shall not be barred." They contend that the "shall not be barred" phrase must be read to say "shall not be barred ... by any statute of limitations or sovereign immunity." They further contend that sections 6(a) and 6(b), when read along with 6(c), create an independent cause of action under WELSA because 6(a) and 6(b) state that the ratification of transactions and extinguishment of claims "are subject to the provisions of section 6(c)" or to "the provisions of this Act." Manypenny and Fineday thus assert that the WELSA drafters intended to provide allottees and their heirs with an "election of remedies."
 
 
 34
 The United States challenges the "election of remedies" argument and contends that section 6(c) merely provides a statute of limitations and a judicial forum to consider challenges to title that are brought under another statute. WELSA does not itself provide a cause of action, the government argues.
 
 
 35
 We have carefully considered Manypenny's and Fineday's arguments and conclude that section 6(c) does not clearly and unequivocally express Congress' waiver of sovereign immunity. We also do not read it to establish a substantive basis for a cause of action.
 
 
 36
 As we stated earlier, a waiver of sovereign immunity cannot be implied--it must be express. No mention of sovereign immunity or waiver appears in section 6(c), nor can we discern from the language employed any clear congressional intent to waive the immunity defense.
 
 
 37
 The government argues that section 6(c) merely establishes a statute of limitations for bringing cases arising out of title disputes to the lands in question. It contends that the litigant must rely on another federal statute[8] to provide a waiver of sovereign immunity and the basis for a substantive cause of action.
 
 
 38
 Our analysis of WELSA persuades us that the government's view is correct. Congress enacted WELSA to "settle unresolved legal uncertainties" because "existing and potential lawsuits involving many and diverse interests in Minnesota ... are creating great hardship and uncertainty for government, Indian communities, and non-Indian communities." WELSA, §§ 2(1), 2(6).
 
 
 39
 Given the explicit purpose of WELSA, the clear and express terms of section 6(d) establishing a cause of action and waiving sovereign immunity as to such an action, and the absence in section 6(c) of comparable language expressing the United States' consent to be sued, we conclude that section 6(c) does not provide a basis for Manypenny's and Fineday's claims and that the federal courts thus lack jurisdiction to consider those claims.[9]
 
 III.
 
 40
 Manypenny and Fineday next argue that the district court improperly dismissed their claims against the State of Minnesota on the ground that the eleventh amendment raises a jurisdictional bar. They assert that the State of Minnesota, by participating in WELSA as a contributor to the settlement and as a beneficiary of the Act's resolution of claims, implicitly waived its eleventh amendment immunity.
 
 
 41
 Waivers of eleventh amendment immunity, whether by Congress or by the individual state, must be clearly and expressly stated. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). We conclude that the State of Minnesota's participation in WELSA is not sufficient to give rise to a waiver of eleventh amendment immunity. We also do not find any evidence in WELSA itself that Congress intended to abrogate that immunity.
 
 IV.
 
 42
 Finally, Manypenny and Fineday argue that the district erred in dismissing the three counties and individual defendants on the basis that the United States is an indispensable party to this action. We have carefully considered the arguments on this issue and see no basis for concluding that the district court erred in dismissing these parties.
 
 
 43
 For the foregoing reasons, we affirm the orders of the district court.
 
 
 44
 FLOYD R. GIBSON, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 I concur with the majority insofar as it holds that the plaintiffs' suit for monetary damages against the various state and federal defendants is barred. I also agree that WELSA's terms do not clearly and explicitly waive either the federal government's sovereign immunity or the state's protections under the eleventh amendment. Nonetheless, I dissent from the majority insofar as it prevents the plaintiffs from pursuing an action with respect to these lands because Congress clearly allowed such actions to take place.
 
 A. WELSA's Role in this Dispute
 
 46
 The majority holds that "section 6(c) merely establishes a statute of limitations for bringing cases arising out of title disputes to the lands in question" and does not provide the plaintiffs with a cause of action. Ante at 1065. I agree with this holding; however, a statute of limitations cannot exist in a vacuum. WELSA does not provide a cause of action, therefore the statute of limitation provided by WELSA must apply to a cause (or causes) of action contained outside of WELSA. Our task, then, is to determine what causes of action WELSA supplies with a statute of limitations. I conclude that WELSA's special limitation period applies to all causes of action, state or federal, other than those designed to challenge the adequacy of WELSA's compensation provisions pursuant to the Tucker Act as provided for by section 6(d), and those designed to review the administrative determination of the amount of compensation due as provided for by section 8(d). This conclusion is based on the wording and legislative history of section 6(c).
 
 
 47
 Section 6(c) provides that its limitation period is to be applied "[n]otwithstanding any provision of law other than the provisions of this section...." (Emphasis added). It also applies the limitation period to "any action in any court to recover title or damages relating to [the disputed land transactions]." (Emphasis added). Consequently, as long as the time constraints of section 6(c) are met, allottees and their heirs should be permitted to premise a cause of action upon theories that would be otherwise unavailable.[1]
 
 
 48
 This interpretation of section 6(c) has two primary effects: it shortens limitation periods that would extend well beyond the enactment of WELSA and affords potential plaintiffs one final opportunity to reclaim lands lost by their ancestors. These effects reflect two of Congress' primary concerns. On one hand, Congress desired to resolve the title problems surrounding White Earth as expeditiously as possible. WELSA, Pub.L. No. 99-264 § 2(1) & 2(2), 100 Stat. 61 (1986) [hereinafter WELSA]; see also 131 Cong.Rec. 36,226 & 36,234 (1985) (statements of Sens. Boschwitz & Durenburger).[2] Congress' concerns in this regard proved to be well-founded when this court, in a case involving allotments from a different Indian reservation in Minnesota, later applied a forty year limitation period to a suit between an allottee's heir and a non-governmental owner of the allotment. Wardle v. Northwest Inv. Co., 830 F.2d 118, 122-23 (8th Cir.1987).[3]
 
 
 49
 Congress was also concerned that many potential claimants were unaware of their claims. At the time Congress was considering WELSA, the potential claimants were located around the country, many were no longer (or had never been) members of the White Earth Band, and many never knew of their potential claims. Unresolved Claims on the White Earth Indian Reservation: Hearing Before the Select Committee on Indian Affairs, 98th Cong., 1st Sess. 92 (1983) (statement of Michael Cox, Department of the Interior) [hereinafter Unresolved Claims]; 131 Cong.Rec. 36,401-02 (1985) (statement of Sen. Boschwitz). The Department of the Interior, believing that its trust relationship with the White Earth Chippewas had ended, stopped keeping the allottees' genealogical records over sixty years prior to WELSA's enactment. Unresolved Claims at 91-92. Concerned that many people lost rights to land without ever knowing that they had rights to land, Congress extended these individuals one final, narrow opportunity to file suit. Congress intended that "[a]ny such action filed within the time period allowed by [section 6(c) ] not be barred," WELSA § 6(c) (emphasis added); the plain meaning of this language suggests that this court is obligated to allow the plaintiffs to pursue any time-barred theory.
 
 B. Claims Against the Federal Government
 
 50
 The United States purports to own some of the land that is the subject of this dispute because it purchased land from various counties that had seized the land for non-payment of taxes. S.Rep. No. 192, 99th Cong., 1st Sess. 10 (1985). Although the United States ordinarily enjoys broad immunity to suit, the Quiet Title Act, 28 U.S.C. § 2409a (1988), waives the federal government's sovereign immunity in suits in which the United States' title to real property is challenged. Id. § 2409a(a); see also Block v. North Dakota, 461 U.S. 273, 286, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983) ("We hold that Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property."). The QTA requires that suits be brought within twelve years after "the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g) (1988). The district court correctly determined that the plaintiffs in the instant case failed to file within the QTA's limitation period. Manypenny v. United States, No. 4-86-770, slip op. at 11 (D.Minn. Feb. 12, 1988). However, because WELSA supplants the QTA's built-in statute of limitation, the plaintiffs' failure to satisfy the QTA's requirements in this regard is not fatal. The plaintiffs should be permitted to continue their challenge to the United States' title to the lands in question because the QTA waives the United States' sovereign immunity and this suit was filed within the time period prescribed by WELSA.
 
 C. Claims Against the State
 
 51
 The State, in some cases solely and in other cases jointly with a county, claims ownership of some of the lands in question. Similar to the United States' claim of ownership, Minnesota's claim can be traced to the failure of allottees to pay taxes. S.Rep. No. 192, 99th Cong., 1st Sess. 10 (1985). Although the eleventh amendment prevents federal courts from adjudicating the legal title to these lands without the state's consent, see Florida Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 682, 703 & n. *, 102 S.Ct. 3304, 3313, 3324 & n. *, 73 L.Ed.2d 1057 (1982), the eleventh amendment does not deprive the plaintiffs of all possible recourse in federal court. The plaintiffs should be permitted to pursue an action to remove state officials from possession of the lands, thereby obtaining the right to immediate possession. The land is occupied and controlled by state officials, and the eleventh amendment will not protect the officials if their occupation and control is premised on violations of federal law. Cf. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) ("[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct,...."); Allegheny County Sanitary Auth. v. United States Environmental Protection Agency, 732 F.2d 1167, 1174 (3d Cir.1984) (citing Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Consequently, the federal courts are permitted to determine who has the right to immediate possession as between state officials and the plaintiffs,[4] and the plaintiffs are not without recourse in federal court.
 
 D. Claims Against the Counties
 
 52
 The district court believed that Fed.R.Civ.Pro. 19(b) required the claims against the counties be dismissed because an indispensable party, the United States, could not be joined. As we have previously noted,
 
 
 53
 "Rule 19(b) suggests four 'interests' that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled.... First, the plaintiff has an interest in having a forum.... Second, the defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another.... Third, there is the interest of the outsider whom it would have been desirable to join.... Fourth, there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies."
 
 
 54
 Nichols v. Rysavy, 809 F.2d 1317, 1332 (8th Cir.) (quoting Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109-11, 88 S.Ct. 733, 737-38, 19 L.Ed.2d 936 (1968)) (emphasis added), cert. denied, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987). The district court applied this analysis and concluded the first and last factors weighed in favor of dismissal and the remaining two factors weighed against dismissal. Manypenny v. United States, 125 F.R.D. 497, 502 (D.Minn.1989). In breaking this tie in favor of dismissal, the court determined that the dominant factor was "the government's interest in protecting itself from liability." Id.
 
 
 55
 I believe the dominant factor in this case is the plaintiff's interest in a forum, and equity and good conscience therefore mandate that we allow this suit to continue. Congress has, through the language contained in WELSA, expressly indicated to potential claimants that suits to regain title would not be barred. Congress also expressly provided that such suits take place only in the Federal District Court for the District of Minnesota, WELSA, § 6(c); presumably it did so because it recognized that federal issues would permeate these title disputes. Surely it did not include this provision merely to have the district court be unable to decide the dispute. By pursuing this cause of action at Congress' invitation, the plaintiffs have given up any opportunity to receive compensation under WELSA. Id. The United States' exposure to liability is extremely limited because WELSA applies to only one band of one Indian tribe; other allottees (and their heirs) cannot rely upon WELSA. Liability is also limited because potential lawsuits had to be filed within a very narrow timeframe. Finally, if the district court's analysis is correct, every case of this type would have to be dismissed because every such case would implicate United States' interests. See Manypenny, 125 F.R.D. at 502. Equity thus requires that we allow the claimants an opportunity to plead their case; to dismiss this case on purely procedural grounds renders Congress' promise a cruel hoax.
 
 E. Rationale for Utilizing These Arguments
 
 56
 The arguments espoused in Parts B and C of my dissent were not raised on appeal, though the plaintiffs did rely upon the QTA in the district court. Nonetheless, I would rely upon these arguments despite the procedural shortcomings.
 
 
 57
 If the majority's position is correct, no court could adjudicate the merits of this dispute because all attempts would be dismissed on the same procedural grounds brought to bear in this case. This is anomalous, given Congress' express statement that such suits would not be barred. We should not reach a result that bars all such suits when WELSA indicates that these suits are permitted. Furthermore, today's decision will have a very narrow impact. WELSA applies to only one Indian band, and is apparently the only legislation concerning allotments that expressly provides that suits such as the one at issue are permitted. WELSA's special limitation period has passed, so a decision favorable to the plaintiffs would not encourage large numbers of lawsuits. Finally, and most importantly, the plaintiffs have foregone an opportunity to seek compensation under WELSA because WELSA indicated that this suit was permitted. If Congress intended that monetary compensation under WELSA be the sole remedy available to these plaintiffs, it would have (and should have) explicitly so stated, thus putting plaintiffs on notice to seek monetary compensation under the timeframe provided or be forever barred from seeking any form of relief. It does not serve the cause of justice[5] to place these plaintiffs in the Catch-22 situation of being allowed to sue these defendants, yet at the same time telling them we have no jurisdiction due to various sovereign doctrines and procedural rules.
 
 F. Conclusion
 
 58
 For the above reasons, I would remand this case to allow the plaintiffs to amend their pleadings as suggested by Part C and then allow the case to proceed as described in the remainder of my dissent.
 
 
 
 [1]
 The Honorable David S. Doty, United States District Judge for the District of Minnesota
 
 
 [2]
 The sole claim not dismissed was one asserted against the Minnesota Commissioner of Revenue in his individual capacity; the district court concluded that the Commissioner could be personally liable for certain alleged unlawful taxation of White Earth land during his tenure in office. Manypenny, slip op. at 30-31 (Feb. 16, 1988)
 
 
 [3]
 The Clapp Amendment, 34 Stat. at 353, stated in part:
 [A]ll restrictions as to sale, incumbrance, or taxation for allotments within the White Earth Reservation in the State of Minnesota, now or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple....
 
 
 [4]
 Such an action became barred under WELSA on March 21, 1988 when the Secretary published a notice in the Federal Register of the appropriation of funds by Congress and the Minnesota legislature and the execution of the agreement to transfer the 10,000 acres of land. Manypenny and Fineday filed their complaints before this date
 
 
 [5]
 Four plaintiffs are named in both complaints
 
 
 [6]
 The district court stated:
 Here, [class] certification would reverse the opt out provisions ... and thereby alter the congressionally mandated presumption of participation in WELSA (footnote omitted). It would in this manner frustrate the intent of Congress, which enacted WELSA to "settle unresolved legal uncertainties" without the "great expense ..., expenditure of time, and ... profound negative impact on ... everyone on the reservation" of litigation. It is for another court to determine the validity of WELSA. Assuming that it is valid, however, the court cannot find that plaintiffs have shown their approach to be superior to that of Congress.
 Manypenny, slip op. at 21-22 (June 23, 1987).
 
 
 [7]
 Section 6(c) states:
 Notwithstanding any provision of law other than the provisions of this section, any action in any court to recover title or damages relating to transactions described in section 4(a), 4(b), 5(a) or 5(c), shall be forever barred unless the complaint is filed not later than one hundred and eighty days following enactment of this Act, or prior to the publication required by section 6(a), whichever occurs later in time: Provided, That immediately upon the date of enactment of this Act any such action on behalf of the White Earth Band of Chippewa Indians shall be forever barred, unless the publication required by section 6(a) does not take place within two years of the date of enactment of this Act in which case the bar of any such action on behalf of the White Earth Band of Chippewa Indians shall be deemed lifted and nullified: Provided further, That the Secretary shall not issue to the White Earth Band any report rejecting litigation nor submit to Congress any legislation report pursuant to Section 2415 of Title 28, United States Code, relating to transactions described in Section 4(a), 4(b), 5(a) or 5(c) of this Act, until and unless the bar against actions on behalf of the White Earth Band is lifted and nullified. Any such action filed within the time period allowed by this subsection shall not be barred....
 
 
 [8]
 Federal statutes providing a substantive cause of action over a title claim are 25 U.S.C. § 345 (1988) and 28 U.S.C. § 2409a (1988). The district court considered and rejected plaintiffs' claims under both of these statutes. Manypenny, slip op. at 8-11 (Feb. 16, 1989). The court concluded that 25 U.S.C. § 345 waived the federal government's immunity only as to suits seeking to obtain original allotments--which are not at issue here. Id. at 9. It further concluded the 12-year statute of limitations that applies to 28 U.S.C. § 2409a barred the plaintiffs from asserting a cause of action under that statute. Id. at 9-11. On appeal, Manypenny and Fineday argue, as they unsuccessfully did below, that statutes of limitations are not applicable to matters within the government's trust responsibility. As the plaintiffs do not, on appeal, advance any specific claim under 25 U.S.C. § 345 or 28 U.S.C. § 2409a, we do not address their arguments regarding the statutes of limitation applicable to those statutes
 
 
 [9]
 While the overall concerns that are implicit in the dissent are understandable, and in some respects appealing, our responsibility is simply to interpret Congress' intent. We see nothing in either the express language of WELSA or its legislative history to suggest that Congress intended, as the dissent argues, post at 4, to supplant other statutes of limitations with the 180-day period of section 6(c). To the contrary, members of Congress, including WELSA's sponsors, repeatedly stated that the purpose of WELSA was to avoid litigation that would be financially and socially costly and might leave many of the heirs with nothing. 131 Cong.Rec. 36,234 (1985) (statement of Sen. Durenberger); see also 131 Cong. Rec. 36,226 (statement of Sen. Boschwitz). The Senate refused to approve two proposed amendments that potentially would have opened the doors to more litigation. See 131 Cong. Rec. 36,232; 131 Cong. Rec. 36,401. The first proposal would have lengthened the 180-day limitations period of section 6(c) to 18 months. 131 Cong.Rec. 36,231. The second proposal would have required the United States to provide legal assistance to an allottee or heir with a colorable claim upon request and to represent that person if requested. 131 Cong.Rec. 36,250-51. In speaking against the second proposal, one of WELSA's sponsors, Sen. Durenberger of Minnesota, stated: "The purpose of the bill that we are considering, [WELSA], is very simply to prevent litigation." 131 Cong.Rec. 36,251. The legislative history of WELSA makes clear that the purpose of section 6(c) is to preserve the right of those who have justiciable claims to file them, not to resurrect claims that are barred under another statute of limitations. See 132 Cong.Rec. 4215 (1986) (statement of Rep. Vento that WELSA "preserves" claimants' rights). We are not persuaded by the dissent's argument that Congress intended to supplant other statutes of limitations with the 180-day period of section 6(c)
 
 
 [1]
 The majority correctly notes that this suit was filed within the time constraints imposed by section 6(c). See ante page 1062 n. 4
 
 
 [2]
 Senators Boschwitz and Durenburger, both of Minnesota, introduced the bill that eventually became WELSA
 
 
 [3]
 The limitation period in Zay Zah did not begin to run until approximately 1954. See Zay Zah, 259 N.W.2d at 582. Absent WELSA, the Zay Zah plaintiff would have had until 1994 to file suit
 
 
 [4]
 This may appear anomalous, but such a result was permitted in Treasure Salvors, 458 U.S. at 700, 102 S.Ct. at 3322 (plurality opinion). On remand, the Fifth Circuit instructed that the district court's judgment contain the following caveat: "This judgment does not determine in any way whether the State ... is the owner of [the property]." Florida Dep't of State v. Treasure Salvors, Inc., 689 F.2d 1254, 1256 (5th Cir.1982). This seemingly awkward procedure allows federal courts to vindicate federal concerns and determine which party has the right to possess the property without adjudicating the state's legal interests in the property; the state is then free to initiate a proceeding to quiet title. Pagan, Eleventh Amendment Analysis, 39 Ark.L.Rev. 447, 469-71 & n. 87 (1986)
 
 
 [5]
 If this decision stands, the plaintiffs' only remaining recourse is to petition Congress for relief commensurate with the equity of their claims